KIRTON McCONKIE
　Christopher S. Hill (#205738)
　*chill@kmclaw.com*
50 East South Temple, Suite 400
Salt Lake City, Utah 84111
Telephone:  (801) 328-3600
Facsimile:  (801) 321-4893

Attorneys for Global AIG Services, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBAL AIG SERIES, LLC, a Utah limited liability company,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>FIB TREASURY STATUTORY TRUST, a Delaware company; FIRST INDEPENDENCE INTERNATIONAL BANK; DONALD ZSMONADI, an individual; UNION CREDIT AND GUARANTEE, INC., a Puerto Rico corporation with administrative offices in Corona, CA; RICHARD NOAH, an individual; CONRAD NOAH, an individual; GOL BANKING NDE, DOES 1-10,<br><br>　　　　Defendants. | CASE NO.  5:17-cv-01623<br><br>**COMPLAINT**<br><br>Judge _____ |

　　　Plaintiff Global AIG Series, LLC ("Global"), by and through its undersigned counsel, complains and alleges against FIB Statutory Trust ("FIB"), First Independence International Bank ("FII Bank"), Donald Zsmonadi, Union Credit and Guarantee, Inc. ("UC&G"), Richard Noah ("Richard"), Conrad Noah ("Conrad"), and GOL Banking NDE ("GOL") (collectively, "Defendants"), as follows:

_____
COMPLAINT

1

PARTIES, JURISDICTION AND VENUE

1. The plaintiff Global is a limited liability company organized and operating under the laws of the state of Utah, with a principal place of business in Salt Lake County, Utah.

2. The defendant FIB Treasury Statutory Trust is a company organized and operating under the laws of the state of Delaware, with a principal place of business in Corona, California.

3. Upon information and belief, the defendant FII Bank is an entity of unknown form and origin, not incorporated in Utah nor having any members or partners located in Utah, with its principal place of business in Corona, California.

4. The defendant Donald Zsmonadi is an individual residing in Corona, California.

5. The defendant Union Credit and Guarantee, Inc. is a Puerto Rico corporation with its principal place of business in Corona, California.

6. The defendant Richard Noah is an individual residing in Riverside, California.

7. The defendant Conrad Noah is an individual residing in Riverside, California.

8. Upon information and belief, the defendant GOL Banking NDE is an entity of unknown form and origin, not incorporated in Utah nor having any members or partners located in Utah, with its principal place of business in Corona, California.

9. The true names and identities of the Defendant Does One to Twenty, whether individuals, partnerships, corporations, limited liability companies, joint ventures, trusts or otherwise, are presently unknown to Global, who therefore sues them by fictitious names. Global will amend the complaint to show their true names and identities when ascertained. Global alleges on information and belief that each of such fictitious Defendants is legally responsible in some manner for the events and damages alleged herein.

10. In connection with the matters alleged herein, Global alleges on information and belief that some or all of the defendants acted as the agent, co-venturer, principal, alter ego, co-conspirator, employee, partner and/or representative of one or more of the other Defendants, who directed, consented to, authorized and/or ratified such actions. Global further alleges on information and belief that one or more of the Defendants acted as a mere instrumentality, conduit and alter ego for one or

1  more of the other Defendants, who so dominated and controlled the former that their separate identity
2  should be disregarded.
3      11. This Court has jurisdiction over this dispute under 28 U.S.C. § 1332, and the amount in
4  controversy is in excess of the jurisdictional limits of this Court.
5      12. Venue is proper in this Court, as the conduct alleged herein occurred within the state of
6  California.
7      13. Global is a company that, among other things, engages in gold mining in Ghana.
8      14. On or about March 6, 2015, Global entered into a Definitive Agreement ("Agreement")
9  with FIB wherein FIB agreed to provide funding for 10 mining silos and Global agreed to give FIB a
10 percentage of the revenue generated from the mined product. A copy of the Agreement is attached as
11 Exhibit A.
12     15. Global negotiated this contract with Zsmonadi who purported to represent FIB.
13     16. Specifically, FIB agreed to "deliver on or before March 13, 2015 to [Global], a cash
14 payment in the form of certificates of deposit with a maturity date of March 31, 2017 into [Global's]
15 and or assigns accounts at FII Banks, equal to three Million Seven Hundred Fifty Thousand
16 ($3,750,000) 00/100 USD." Agreement at 1.1.
17     17. FIB further agreed to "Capitalize Silos 1 through 10 on or before December 31, 2015 at
18 a cost of Six Million ($6,000,000.) 00/100 USD per Silo for a total of Sixty Million
19 ($60,000,000.) 00/100 USD." Agreement at 1.2.
20     18. Prior to executing the Agreement, Zsmanadi, on behalf of FIB, provided Global FIB's
21 account statement from FII Bank showing that it had $38,646,748.02 of available funds.
22     19. In reliance on FIB's promise of funding, Global began mobilizing the mining operation,
23 including spending $2.2 million in acquiring equipment, shipping equipment, acquiring surveys, site
24 preparation, and other necessary expenditures.
25     20. After execution of the Agreement, Global opened accounts at FII Bank.
26     21. Global was given account numbers from FII Bank personnel, and a username and
27 password to access its accounts online.
28

COMPLAINT
4835-9166-7531

22. Global received online verification that certificates of deposit totaling $3,750,000 had been transferred into Global's accounts.

23. Global could, at any time, use its username and password to log on to the FII Bank website and verify its balances.

24. Indeed, periodically before March 6, 2015 and December 16, 2015, Global did just that – logged into the FII Bank website and verified account balances to the aggregate reported amount of $3,750,000.

25. On or about December 16, 2015, when Global checked its account it was directed to UC&G's website.

26. The web address was the same and Global's username and passwords still provided access to its accounts, but the content of the website showed information for UC&G.

27. Global was concerned and Gordon Anderson, member of Global, contacted Zsmonadi.

28. Zsmonadi told Anderson that a reverse merger had occurred between FII Bank and UC&G, but it would not affect FIB's performance of the Agreement or the availability of the funds previously transferred by FIB and held in Global's accounts at FII Bank.

29. Between March 2016 and August 2016 Anderson and/or other Global agents met with Zsmonadi, Richard and Conrad several times in an office suite located in Corona, California.

30. Upon information and belief, Richard is the owner of UC&G.

31. At a minimum, Richard is and at all relevant times hereto was a principal of an the key officer for UC&G's operations.

32. Conrad is Richard's son and works with him.

33. Prior to meeting at this suite for the first time in March 2016, Zsmonadi had not disclosed to Global the close relationship between FIB, FII , and UC&G.

34. Upon arriving at the offices in Corona, Global learned Zsmonadi shared an office suite with Richard and Conrad.

35. When Global arrived at the office for the first time, the door still said FII Bank and a sign reading UC&G was taped over the top.

36. Zsmonadi, Richard, and Conrad each had separate offices, but they all shared a conference room.

37. Given the reported bank merger and the fact that FIB seemed connected to FII Bank and UC&G, Global wanted reassurances that FIB would perform and that their certificates of deposit would pay out.

38. In an April 2016 meeting including Gordon Anderson and Jason Anderson on behalf of Global, and Roy Nelson from Shamrock Mining, Richard assured Global that its funds were secure and even opened UC&G's safe so that Global could view UC&G's physical assets.

39. The safe appeared to contain several millions of dollars' worth of gold certificates and SKRs.

40. Richard also stated that UC&G was a fully licensed banking entity and that it had to follow all banking laws so there was no need to be concerned about the validity of the certificates of deposit.

41. In this same April 2016 meeting, Global also questioned Zsmonadi regarding the delay in financing the mining silos.

42. Zsmonadi responded by stating that he just had to monetize the assets Richard had shown them and the delay was getting the Safe and Safe Keeping Receipts for the assets in place.

43. Zsmonadi stated to Gordon Anderson and Jason Anderson that it would be just a matter of weeks until they could move forward.

44. Global relied on Richard's assurances and continued to move forward with mobilizing its mining operation in Ghana.

45. When Global raised concerns with Zsmonadi regarding his failure to provide the first round of funding, Zsmonadi consistently reassured Global that FIB was ready to fund the project.

46. In May of 2016, Gordon Anderson and Jason Anderson on behalf of Global and Roy Nelson from Shamrock Mining had a meeting with Zsmonadi, Richard and Conrad at their shared office.

47. The purpose of the meeting was to get an update on funding.

48. Zsmonadi apologized for the delay and said he would wire a good faith payment toward the funding of the project to show he still wanted the project and was capable of funding it.

49. The next week, Jason, on behalf of Global, received a Pagara check made payable to Jason Anderson (Zsmonadi later said he didn't have the name of the company with him so he just made it payable to Mr. Anderson) from BBVA Bank for 1 million euros instead of a wire.

50. Jason and Gordon, on behalf of Global, took the check to Zions Bank to confirm the validity of the check and that the funds would not be released until May 2017.

51. Global contacted Don and told him this was not what was committed to and Global needed a bank wire.

52. Zsmonadi told Jason Anderson to send the check back to him and he would wire the money instead.

53. Jason Anderson sent the check back, the wire never came.

54. Global still had confidence that they would at least receive the $3.75 million given that they had accounts in their names that still showed the certificates of deposit and the $3.75 million as due and payable on March 31, 2017.

55. On or about March 21, 2017, Global was still able to log on to its accounts and the web address was still the same, but once again the name on the website changed.

56. Instead of showing UC&G, for the first time, the website appeared to be for a bank called GOL NDE.

57. That same day, counsel for Global sent a letter to Richard seeking instruction on how to access the funds when they became payable on March 31, 2017.

58. The next day, on March 22, 2017, Global's online account access was blocked.

59. On or about March 31, 2017, counsel for Global sent a second letter to Richard to coordinate the withdrawal and disbursement of the funds.

60. Richard responded that UC&G had not issued any certificates of deposits and did not have any business relationship with Global.

## FIRST CLAIM FOR RELIEF
**(Breach of Contract – Against FIB)**

61. Global incorporates by this reference and re-alleges all preceding allegations of this Complaint as though fully set forth herein.

62. The Agreement constitutes an enforceable contract between Global and FIB.

63. By the acts and omissions alleged herein, FIB breached the Agreement by failing to pay the amounts due.

64. As a direct and proximate result of FIB's conduct, Global has been damaged and will continue to be damaged in an amount to be determined at trial, but not less than $63,750,000.00 plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF
**(Fraud – Against Zsmonadi, Richard, and Conrad)**

65. Global incorporates by this reference and re-alleges all preceding allegations of this Complaint as though fully set forth herein.

66. As set forth above, Zsmonadi, Richard, and Conrad ("Individual Defendants") intentionally or recklessly made false representations of material facts or omitted and failed to disclose material facts to Global necessary to make their representations not misleading.

67. Upon information and belief, these representations were false at the times they were made.

68. Global justifiably and reasonably relied upon Individual Defendants' representations and omissions.

69. Global acted in ignorance of the falsity of the misrepresentations and without knowledge that the omitted facts had been withheld.

70. Global would not have entered into the Agreement or taken actions to prepare the mining operation in Ghana had it known of the material facts which Individual Defendants misrepresented and intentionally chose not to disclose to Global.

71. As a direct and proximate result of Global's reasonable reliance upon the fraudulent misrepresentations and omissions of the Individual Defendants, it has suffered injury and damages in an

amount to be determined at trial, but not less than $2.2 million, together with interest thereon, plus accrued legal fees, opportunity cost, and other damages to proven at trial

### THIRD CLAIM FOR RELIEF
**(Fraud – Against FII Bank, UC&G, GOL NDE)**

72. Global incorporates by this reference and re-alleges all preceding allegations of this Complaint as though fully set forth herein.

73. As set forth above, FII, UC&G, and GOL ("Bank Defendants") intentionally or recklessly made false representations of material facts or omitted and failed to disclose material facts to Global necessary to make their representations not misleading.

74. Each of the Bank Defendants provided Global with account information and access which represented that Global had certificates of deposit that were fully funded and due to be paid on March 31, 2017.

75. Upon information and belief, these representations were false at the time they were made.

76. Upon information and belief, the Bank Defendants are merely constructs of the Individual Defendants used to defraud Global and others.

77. Global justifiably and reasonably relied upon Bank Defendants' representations and omissions.

78. Global acted in ignorance of the falsity of the misrepresentations and without knowledge that the omitted facts had been withheld.

79. Global would not have taken actions to prepare the mining operation in Ghana or let two years pass without seeking additional investors had it known of the material facts which Bank Defendants misrepresented and intentionally chose not to disclose to Global.

80. As a direct and proximate result of Global's reasonable reliance upon the fraudulent misrepresentations and omissions of the Bank Defendants, it has suffered injury and damages in an amount to be determined at trial, but not less than $2.2 million, together with interest thereon, plus accrued legal fees, opportunity cost, and other damages to proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Conversion – Against Bank Defendants and Individual Defendants)

81. Global incorporates by this reference and re-alleges all preceding allegations of this Complaint as though fully set forth herein.

82. In the event FIB did in fact transfer certificates of deposit in the amount of $3.75 million to Global's accounts with the Bank Defendants, those funds are due and payable to Global.

83. Individual Defendants and/or the Bank Defendants have wrongfully made a distinct act of dominion over Global's funds which is inconsistent with Global's rights thereto.

84. Global has been damaged by the Bank Defendants and Individual Defendants in an amount to be proven at trial, but not less than $3.75 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Global AIG Series, LLC requests that judgment be entered in its favor and against defendants as follows:

(1) On the First Cause of Action Judgment against FIB in the amount of not less than $63,750,000.00, the exact amount to be determined at trial;

(2) On the Second Cause of Action, Judgment against the Individual Defendants in the amount of not less than $2.2 million, together with interest thereon, plus accrued legal fees, opportunity cost, and other damages to proven at trial.

(3) On the Third Cause of Action, Judgment against the Bank Defendants in the amount of not less than $2.2 million, together with interest thereon, plus accrued legal fees, opportunity cost, and other damages to proven at trial.

(4) On the Fourth Cause of Action, Judgment against the Individual Defendants and Bank Defendants in the amount of not less than $3.75 million.

(5) Reasonable attorneys' fees as allowed by the Agreement or provided by law;

(6) Applicable interest;

(7) Costs incurred in this proceeding; and

(8) Any other relief the Court deems equitable and just.

DATED:                                                      KIRTON MCCONKIE


By: /s/ Christopher S. Hill
    CHRISTOPHER HILL
    Attorney for Plaintiff
    GLOBAL AIG SERIES, LLC

4835-9166-7531, v. 1